1

2

3

4

5

6

7

8

9                        IN THE UNITED STATES DISTRICT COURT

10                     FOR THE EASTERN DISTRICT OF CALIFORNIA

11   MARK DESMOND ADCOCK,

12                Petitioner,              No. 2:10-cv-705-GEB-JFM (HC)

13        vs.

14   HAWS,                                 <u>ORDER AND</u>

15                Respondent.              <u>FINDINGS AND RECOMMENDATIONS</u>

16   _____/

17            Petitioner is a state prisoner proceeding pro se with an application for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  In the petition filed March 24, 2010, petitioner

19   brings claims for <u>Brady</u>[1] error, prosecutorial misconduct, insufficiency of evidence and

20   ineffective assistance of counsel.

21                        PROCEDURAL BACKGROUND

22            On December 6, 2007, petitioner was convicted by a jury of first-degree murder,

23   in violation of Cal. Penal Code § 187(a)[2], while engaged in a robbery and a burglary, both special

24   _____

25        [1]  <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

26        [2]  All future statutory references will be to the California Penal Code unless noted
     otherwise.

1    circumstances under §190.2(a)(17).[3]  Clerk's Transcript ("CT") 2 at 343.  Petitioner was

2    sentenced to life imprisonment without the possibility of parole.  Id. at 404-05.

3              On August 12, 2008, petitioner appealed to the California Court of Appeal, Third

4    Appellate District.  LD 4.  On March 24, 2009, the state appellate court denied petitioner's direct

5    appeal and affirmed the judgment.  LD 8.

6              On April 29, 2009, petitioner appealed to the California Supreme Court.  LD 9.

7    On June 25, 2009, the state supreme court summarily denied review.  LD 10.

8              On September 29, 2009, petitioner filed a petition for writ of habeas corpus with

9    the California Supreme Court.  LD 11.  On March 10, 2010, the state supreme court summarily

10   denied the petition for review.  LD 12.

11             Petitioner initiated this action on March 24, 2010.  Respondent filed an answer on

12   June 24, 2010.  Petitioner filed a traverse on July 8, 2010.

13                              FACTUAL BACKGROUND[4]

14   *The murder*

15   Daryl Sussdorf owned and operated Nugget Auto Sales, a used car
     dealership in Sacramento.  He ran the business by himself, without any
16   employees.  He provided the financing for his customers; they would purchase
     their cars and make payments at the dealership later.  Sussdorf recorded the
17   payments on account cards and in a receipt book.  When an account was paid off,
     Sussdorf would deliver the title document to the customer.
18
     Most of Sussdorf's customers paid with cash, so he often had a lot of cash
19   at the dealership.  He commonly carried several hundred dollars in his wallet or
     pocket.  He did not make a bank deposit every day; instead, he would do so after
20   accumulating a lot of money.  He kept a moneybag in the office for making
     deposits.
21
     /////
22

23   _____

24   [3]  Petitioner was tried with his codefendant Russell Jones, though they had separate juries.
     Jones was also convicted of first-degree murder with the same special circumstance findings.

25   [4]  The statement of facts is taken from the opinion of the California Court of Appeal for
     the Third Appellate District in People v. Adcock, No. C058167 (March 24, 2009), a copy of
26   which was lodged by respondent on June 24, 2010 as Lodgment 8.

The door to the dealership's office locked automatically, so Sussdorf knew who was coming and going. The office had two floors. There were security cameras outside the dealership but they did not work. On two occasions, codefendant Russell Jones had purchased cars from Sussdorf.

In January 2005 (all of the events described herein occurred in 2005 unless otherwise indicated), Sussdorf's wife was suffering from terminal cancer. Their daughter, Kathy Jenson, was caring for her. Sussdorf and Jenson spoke by telephone approximately five to 10 times per day.

On January 21, at about 4:15 p.m., Lon'ette Cannon went to the dealership and paid Sussdorf $400. He was alone. Cannon chatted with him for a few minutes and then left at 4:30 p.m.

Jenson last spoke to Sussdorf at about 5:00 p.m. that evening. After that, she telephoned him several times but he did not answer or return her calls. He would usually arrive home at about 6:45 p.m. or call to say that he was running late.

By 7:00 p.m., Jenson was very concerned because neither she nor her mother had heard from Sussdorf. She sensed something was wrong, so she picked up her fiancé, Chris Valenzuela, and went to the dealership. While enroute, Valenzuela telephoned 911 and told the Sacramento County Sheriff's Department about the situation.

Jenson and Valenzuela arrived at the dealership at about 8:15 p.m., and her brother, Dale Sussdorf, arrived soon afterward. Valenzuela started looking around. The office door was locked and the blinds were closed, but Valenzuela could see inside by looking through the gaps between each blind. He saw a large amount of blood and papers scattered about.

Sacramento County Sheriff's Deputy Quis Formoli arrived a few minutes after Jenson and Valenzuela. Dale Sussdorf kicked open the door and Formoli went inside.

There was blood in many places on the first floor of the building, including on the floor, on the blinds, and under the desk chair. Skull fragments and soft tissue were on a wall, and body tissue was on the floor. In addition, there was blood on the staircase, blood dripping down an upstairs wall, and blood on an upstairs carpet.

Sussdorf was sitting on a chair on the second floor. His jeans were down below his knees. His head was bleeding profusely and he was gasping for air. He did not respond to Deputy Formoli.

Deputy Formoli went back downstairs and told Valenzuela about Sussdorf's condition. Valenzuela, who was a firefighter and emergency medical technician, went upstairs with Formoli. They administered first aid until paramedics arrived.

/////

3

The paramedics removed Sussdorf's clothing in order to treat him. A detective later examined Sussdorf's jeans and observed that the right rear pocket had been torn from the seams that attached it to the pants. There was no money in any of the pockets.

Behind the desk on the first floor, sheriff's deputies found an empty tan wallet. It looked very similar or identical to Sussdorf's wallet. A bank bag was present in the office.

A receipt book was on the desk on the first floor. It contained a receipt dated January 21 for "400" from Lon'ette Cannon. Also on the first floor, deputies found an account card with codefendant Jones's name written in Sussdorf's handwriting. There was blood on the bottom of the card. The card was found with other account cards and was not the only card with blood on it. No money was found in the office.

Sussdorf had suffered 11 blows to his head. Ten days later, he died of his injuries. The injuries were consistent with blows from a hammer.

*[Petitioner]'s admissions to J.B.*

J.B. met [petitioner] in 1992 or 1993. They lost contact but in 2004 they resumed their social relationship and used heroin together. J.B. later stopped using heroin and underwent Methadone and Cyboxin treatment.

One day during a telephone conversation, [petitioner] told J.B. that [petitioner] was in trouble. [Petitioner] began to say that he had been with someone who had "beat[en a] man up side his head . . . with a hammer." J.B. told [petitioner] to stop talking because the police might be listening, and to speak with him in person instead.

J.B. then met [petitioner] at the Methadone Clinic in Sacramento, where they both were patients. [Petitioner] told J.B. the following: he and another "guy" went to "hit a lick," which means to rob someone, at an auto dealership. The victim was an old man. They "stripped" (robbed) the victim and, while they were doing so, [petitioner]'s cohort "went crazy" and started beating the victim with a hammer. This "spooked" [petitioner], who went outside and acted as a lookout.

[Petitioner] told J.B. that he and his companion took $800 from the victim. Afterward, they used the money to purchase crack cocaine and heroin and got high. [Petitioner] did not tell J.B. that the victim had died; J.B. learned that from the news.

J.B. informed investigator Andre Lemay of the California Department of Justice that he knew about the crime. Lemay put J.B. in contact with the Sacramento Sheriff's Department. J.B. then told Detectives Cabral and Kolb what [petitioner] had told him.

J.B. later learned that a foundation was offering a $5,000 reward in connection with this crime. He told Lemay that he hoped to qualify for the reward. He could get the reward if there was a conviction.

In 1998, J.B. had been convicted of felony burglary.  Then in 2004, he had been convicted twice of that offense.  He served a prison sentence for the 1998 conviction.  After that conviction, he became a police informant.  He had provided information to Andrew Lemay on occasion.  He had also provided information to the Oakland Police Department.  For his convictions in 2004, he received consideration in sentencing because he was providing information to law enforcement.

J.B. informed the Sacramento County District Attorney's Office that [petitioner]'s friends and family had called him and threatened his life.  The District Attorney's Office relocated him for his safety.  The office spent about $22,300 on J.B., including moving expenses, hotel stays, periodic rent payments, and return trips to safety.  The office does not pay his daily living expenses. That was the only money that J.B. received for providing information about this case.

*[Petitioner]'s arrest and statements to law enforcement*

On February 23, after speaking with J.B. and obtaining an arrest warrant, Detectives Cabral and Kolb, together with other officers, arrested [petitioner] in San Francisco.  During the ride back to Sacramento, [petitioner] waived his *Miranda* (*Miranda v. Arizona* (1966) 384 U.S. 436 [17 L.Ed.2d 694]) rights and spoke with the detectives.  The conversation was recorded but road noise made the recording difficult to hear.

[Petitioner] told the detectives that he and codefendant Jones walked from Jones's home to the dealership to do a "lick," which means a robbery. [Petitioner] waited at the corner while Jones went inside. When Jones came back outside, they walked to a bus stop.

The detectives interviewed [petitioner] on videotape when they returned to Sacramento.  During the interview, [petitioner] said the following: J.B. was a family friend.  On the day of the crime, Jones was wearing a puffy black jacket and red gloves. Jones was in Sussdorf's office for a total of 10 to 15 minutes. Jones told [petitioner] that he had hit Sussdorf "several times" because he did not want Sussdorf to come after him.  During the bus ride afterward, Jones showed [petitioner] Sussdorf's wallet, which contained checks from Nugget Auto Sales. Jones took $860 from Sussdorf's pocket, and he and [petitioner] spent it on drugs and a motel room.  The duo stayed in the motel from the Friday to the Sunday following the murder.  The murder weapon, a hammer, was disposed of there. Jones was worried about blood being on his jacket.

[Petitioner] told the detectives that a "lick" was "like a petty theft" or "like going into a grocery store." It also meant getting money from someone.  At one point during the interview [petitioner] stated that, prior to the robbery, Jones would not tell him how he was going to get the money.  At another point, [petitioner] stated that Jones had told him he might be able to get into the office and grab some cash while the person who worked there was dealing with customers. [Petitioner] did not know that Jones planned to carry out a "strong-armed robbery." [Petitioner] denied ever leaving the sidewalk during the robbery, and he told the detectives that they should check the security cameras to verify this.

[Petitioner] was consistent in his story to the detectives.  He expressed willingness to help the detectives, and he volunteered to wear a wire, to make a pretextual telephone call to Jones, or to be placed in a room with Jones and have the conversation recorded. The detectives used the last two techniques.

It was stipulated that on the day of the attack, [petitioner] and Jones checked into a Motel 6 in Sacramento, checked out two days later, and paid in cash.

*Searches of Jones's residence*

Jones's house was searched on the day of his arrest.  The search yielded a pair of gloves that were made of red fibers that matched fibers found on Sussdorf's jeans.

The search also yielded a receipt dated April 21, 2003.  "Daryl" had handwritten on the receipt that he received $250 from Jones and was still owed $1,158.

The search also yielded a hammer.

A few days after the search, detectives returned to the Jones residence and asked Jones's mother whether she had a black puffy jacket.  Jones's mother retrieved a black puffy jacket from Jones's bedroom closet.  Bloodstains on the jacket contained Sussdorf's DNA.  Jones's mother testified that she did not know whose jacket it was, but she had seen Jones wearing a puffy jacket.  A photograph of Jones taken the month before the attack appeared to show him wearing the jacket.

*Defense*

J.B. had been relocated to Sacramento after having testified in a San Francisco homicide.  In an affidavit supporting [petitioner]'s arrest warrant, Detective Kolb wrote that J.B. was a "mercenary informant," meaning a person who supplied information for money.  The affidavit also said that J.B. was known as a reliable informant who had provided reliable information on serious cases in the Bay Area.

One or two days after the attack, Detective Kolb posted reward notices near the dealership.  The notices said that Sussdorf had been brutally assaulted at his place of business.  There was news coverage of the crime, and the police held a press conference.  At the conference, the police did not release the details of the homicide, such as the fact that Sussdorf had been beaten.  When J.B. spoke with Kolb, he provided information that had not been released to the public.

Codefendant Jones did not present any evidence.

People v. Adcock et al., slip op. at 2-10.

/////

ANALYSIS

I.      Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

Under the  "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")  The court looks to the last reasoned state court decision as the basis for the state court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

/////

II.   <u>Petitioner's Claims</u>

    1.   <u>Ground One</u>

        In ground one, petitioner claims the prosecutor committed <u>Brady</u> error by failing to seek impeachment evidence as to J.B. from other agencies and by further failing to produce certain evidence that petitioner's appellate counsel found during an Internet search.

       a.   <u>State Court Opinion</u>

        The last reasoned rejection of petitioner's <u>Brady</u> claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal:

> [Petitioner] contends the prosecutor violated *Brady* by failing to seek information regarding witness J.B. from agencies that were not involved in this case. We disagree.
>
>    *A.*   *[Petitioner]'s discovery request*
>
> In October 2007, [petitioner] filed a motion in limine seeking to exclude J.B.'s testimony "unless previously requested information [was] made available to the defense regarding bias, credibility and veracity . . . ." [Petitioner] did not identify any specific evidence that he was seeking.
>
> At a hearing on the motion, [petitioner]'s counsel argued that he needed information about J.B.'s prior conduct as an informant so he could demonstrate that J.B. was fabricating his testimony about [petitioner]'s confession in order to reap a financial reward. Counsel admitted that the prosecution had given him J.B.'s rap sheet.
>
> The prosecutor responded that the prosecution did not have any documentation on J.B.'s history other than the rap sheet; nor did it have any information about his prior activities as an informant or his testimony from his previous trials. The prosecution had given the defense everything it had concerning J.B., including the rap sheet, "two or three impeachable felonies," and a list of expenditures the prosecution had "undertaken to provide" for J.B. The prosecutor added that both parties knew about the reward in this case. In addition, defendant possessed the name of J.B.'s "handler" at the California Department of Justice, Andre Lemay, and had the opportunity to interview him. Defense counsel said he had called Lemay once or twice but Lemay had not called back.
>
> Defense counsel conceded that the prosecution had given the defense everything it had but asserted that "the executive branch of the government has information through enforcement on [J.B.]" Defense counsel requested an Evidence Code section 402 hearing in order to question J.B. about his history as an informant.

8

Defense counsel further explained that he wanted the prosecution to provide police reports from the cases in which J.B. had been convicted. The prosecutor said that he did not have those reports. The court asked whether these were Sacramento cases, and the prosecutor responded, "I think some are and some aren't." Defense counsel interjected, "it's between the Bay Area and Sacramento." The prosecutor noted that the defense had possessed J.B.'s rap sheet for a long time and could have ordered the police reports. The court deferred ruling on [petitioner]'s discovery request and request for an Evidence Code section 402 hearing (Further references to "section 402" are to the Evidence Code).

   B.   *J.B.'s testimony at the Evidence Code section 402 hearing*

Before J.B. testified in front of the jury, the trial court held an Evidence Code section 402 hearing, as [petitioner] had requested. J.B. was the only witness and gave the following testimony: in the past, he has been an informant for Special Agent Andrew Lemay. He first became an informant for Lemay in 2003. He talked to Lemay from 2003 to 2005. He last spoke with Lemay on the day he was relocated, in about March 2005.

J.B. had given information to Lemay, and later had testified, in an Alameda County murder trial. Afterward, the Oakland Homicide Detail assisted J.B. in moving away from Alameda County.

J.B. did not know how many times he had given Lemay information that started an investigation. He and Lemay had talked on the telephone "a vast amount of times about a vast amount of different things." The present case was the only matter where J.B. gave Lemay information about a criminal investigation that was already ongoing. Lemay had never paid J.B. for providing information, and J.B. did not receive payment from any other source.

In 2004, J.B. was sentenced in an Oakland burglary case. He received a benefit, in that after having violated parole he was sentenced to jail rather than sent back to prison. At about the same time in another case, a charge of first degree burglary was reduced to second degree burglary, and J.B. received probation.

J.B. had continued to act as an informant since the last time he spoke with Lemay, but he refused to say for whom unless [petitioner] was removed from the courtroom. Before 2005, J.B. had been an informant for the Alameda County Narcotics Task Force, the Oakland Police Department Narcotics Task Force, and the Oakland Homicide Detail.

The Sacramento District Attorney's Office relocated J.B. and his family because of information he provided in this case. The office paid J.B.'s relocation expenses "and stuff pertaining to that." J.B. did not receive anything from any other source in connection with this case. J.B. had asked Lemay if there was a reward in this case, and Lemay said there was a $5,000 reward.

/////
/////

C.     *Analysis*

"In *Brady*, the United States Supreme Court held 'that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' [Citation.] The high court has extended the prosecutor's duty to encompass the disclosure of material evidence, even if the defense made no request concerning the evidence. [Citation.] The duty encompasses impeachment evidence as well as exculpatory evidence. [Citation.] Such evidence is material 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' 'A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' [Citation.] '"[T]he reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case."' [Citation.] Defendant has the burden of showing materiality. [Citation.]" (*People v. Hoyos* (2007) 41 Cal.4th 872, 917-918.)

In this case, defense counsel was "seeking evidence that [J.B.] had given false information in the course of his long career as an informant." On appeal, [petitioner] argues the prosecutor was "duty-bound to seek this *Brady* material" from other agencies not involved in this case. We disagree.

"Under *Brady*, the prosecutor's duty extends to evidence 'known to the others acting on the government's behalf' [citation], '[b]ut the prosecution cannot reasonably be held responsible for evidence in the possession of *all* government agencies, including those not involved in the investigation or prosecution of the case. . . . "[I]nformation possessed by an agency that has no connection to the investigation or prosecution of the criminal charge against the defendant is not possessed by the prosecution team, and the prosecutor does not have the duty to search for or to disclose such material." [Citation.]' [Citations.]" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1133.)

[Petitioner] does not contend the prosecutor failed to obtain information in the possession of the Sacramento County District Attorney or the Sacramento County Sheriff.

[Petitioner]'s claim of prejudice relies in part on a discussion of J.B. in an unpublished opinion of the Court of Appeal, First Appellate District.  Rather than rely on the opinion as legal authority (Cal. Rules of Court, rule 8.1115, subd. (a)), [petitioner] asks that we take judicial notice of the opinion.  We decline to do so, because the opinion is not "relevant under the doctrines of law of the case, res judicata, or collateral estoppel."  (Cal. Rules of Court, rule 8.1115, subd. (b); see also *In re Bush* (2008) 161 Cal.App.4th 133, 146, fn. 5.)

[Petitioner]'s claim of prejudice also appears to rely on a February 2008 online news article, retrieved via the search engine Google, recounting the arrest of a person with the name of the informant, who resided out of state, for investigation of first degree murder.  Because the murder occurred on February 19, 2008, after this trial concluded on February 1, 2008, it could not have shed any light on J.B.'s credibility.

1    [Petitioner]'s *Brady* claim has no merit.

2  People v. Adcock, slip op. at 14-19.

3    b.    Analysis

4    Under Brady v. Maryland, 373 U.S. 83 (1963), the government has a constitutional

5  obligation to disclose information favorable to the defense.  A successful Brady claim requires

6  three findings: (1) the government willfully or inadvertently suppressed evidence; (2) the evidence

7  was favorable to the accused; and (3) the evidence was material to the issue of guilt or

8  punishment.  Strickler v. Greene, 527 U.S. 263, 281-82 (1999); see Banks v. Dretke, 540 U.S.

9  668, 691 (2004); Kyles v. Whitley, 514 U.S. 419, 433 (1995).  Evidence is material for Brady

10  purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense,

11  the result of the proceeding would have been different."  Kyles, 514 U.S. at 433 (quoting United

12  States v. Bagley, 473 U.S. 667, 682 (1985)).  This does not require a showing that the defendant

13  would have been acquitted had the suppressed evidence been disclosed.  Id. at 434-35.  Instead, a

14  Brady violation occurs if "the favorable evidence could reasonably be taken to put the whole case

15  in such a different light as to undermine confidence in the outcome."  Id. at 435.

16    The duty to disclose includes impeachment as well as exculpatory material.

17  Bagley, 473 U.S. at 676; Giglio v. United States, 405 U.S. 150, 154 (1972).  Generally, "the

18  individual prosecutor has a duty to learn of any favorable evidence known to the others acting on

19  the government's behalf in the case, including the police."  Kyles, 514 U.S. at 437.  The

20  prosecutor does not, however, have a duty "to learn of or search for information in the possession

21  of agencies that are not at all involved in the government's investigation or prosecution."  United

22  States v. Rodriguez, 360 Fed. Appx. 743, 747 (9th Cir. 2009).  Moreover, there can be no Brady

23  violation "when information is fully available to a defendant at the time of trial and his [or her]

24  only reason for not obtaining and presenting the evidence to the Court is his [or her] lack of

25  reasonable diligence . . . ."  United States v. Brown, 628 F.2d 471, 473 (5th Cir. 1980).  See also

26  United States v. Dixon, 132 F.3d 192, 199 (5th Cir. 1997) ("Brady does not obligate the

government to produce for a defendant evidence or information already known to him, or that he could have obtained from other sources by exercising reasonable diligence." (alteration and internal quotation marks omitted)); United States v. Stuart, 150 F.3d 935, 937 (1998) ("When defendants fail to recognize the exculpatory nature of documents to which they have access, Brady cannot be invoked to resuscitate their defense after conviction.").

## I.    Failure to Exhaust

Respondent argues that petitioner's Brady claim is procedurally barred because petitioner's theory underlying the violation is unexhausted.  Specifically, in his direct appeal to the California Court of Appeal, petitioner argued that the prosecutor violated Brady when he (1) failed to seek evidence that J.B. had given false information in the course of his history as an informant, (2) failed to turn over J.B.'s most recent arrest and police reports, and (3) failed to turn over evidence that appellate counsel located after conducting an Internet search.  See LD 4 at 17-22, 30 n.10.  In his direct appeal to the California Supreme Court, as well as in his habeas petition to the same court, petitioner argued that the prosecutor violated Brady when he failed to inquire about J.B.'s history as an informant from Special Agent Andre Lemay, J.B.'s handler at the California Department of Justice ("DOJ").  See LK 9 at 4.  The court finds that petitioner's argument about Agent Lemay is exhausted, as it was subsumed in the argument that petitioner did present in his direct appeal to the California Court of Appeal, but finds that the remaining arguments are unexhausted.  Nonetheless, for the reasons set forth infra, all claims should be denied as meritless.  See 28 U.S.C. § 2254(b)(2).

## ii.    Discussion

Petitioner asks the court to find that the prosecutor was constitutionally required to search for impeachment evidence from all law enforcement and prosecuting agencies who had come into contact with J.B.  The last court to consider this claim, the California Court of Appeal, denied it on the grounds that the prosecutor was not required to search for information from agencies that were not involved in the investigation of petitioner and that the only agencies

1   involved in the investigation of petitioner were the Sacramento County Sheriff's Department and

2   the Sacramento County District Attorney's Office.  See LD 8 at 18-19.  Petitioner argues that the

3   DOJ should be deemed involved in the investigation of petitioner because DOJ Agent Lemay

4   received information about the crime from J.B., which he forwarded to the Sacramento County

5   Sheriff's Department and which was used to arrest petitioner.  Petitioner argues that evidence

6   from Agent Lemay could have been used to impeach J.B.'s credibility during trial.

7         "[T]he exact point at which government agents can fairly be categorized as acting

8   on behalf of the prosecution, thus requiring the prosecutor to seek out any exculpatory or

9   impeachment evidence in their possession, is uncertain."  Chandras v. McGinnis, 2002 WL

10   31946711, at *7 (E.D.N.Y. Nov. 13, 2002).  At one end of the spectrum, it is clear that the

11   investigating case agents on a particular prosecution are part of the prosecution team; their

12   possession of producible material is imputed to the prosecutor regardless of his actual knowledge.

13   See, e.g., Kyles v. Whitley, 514 U.S. 419, 438 (1995) (rejecting the argument that a state

14   prosecutor "should not be held accountable ... for evidence known only to police investigators and

15   not to the prosecutor.");  United States v. Morell, 524 F.2d 550, 555 (2d Cir. 1975) (holding

16   government agent to be an arm of the prosecutor where he: (1) actively participated in the

17   investigation; (2) supervised a confidential informant; and (3) sat throughout trial at counsel table

18   with the prosecutors).  At the other end of the spectrum, government agents of a separate

19   sovereign who are wholly uninvolved in the investigation being prosecuted are clearly not part of

20   the prosecution team.  See, e.g., Shakur v. United States, 32 F. Supp. 2d 651, 665-66 (S.D.N.Y.

21   1999) ("whatever knowledge [the undercover NYPD officer] and his superiors gained ... during

22   [the officer's] undercover activities ... may not be imputed to the federal prosecution team").

23         The facts of this case fall in the gray area between these two end points.  Here, the

24   only evidence of Agent Lemay's "participation" in the investigation of petitioner is the fact that

25   Agent Lemay contacted Deputy Sheriff Robin Kolb of the Sacramento County Sheriff's

26   Department to relay information he learned from J.B., which Agent Lemay found to be "factual

and reliable," and to provide Detective Kolb with J.B.'s telephone number.  See CT 1 at 18.

Other than forwarding this information, however, there is nothing in the record to show that Agent

Lemay participated in the investigation of petitioner.  It is evident, then, that Agent Lemay's

participation was only fleeting.  Without more, the court cannot find that Agent Lemay was an

arm of the prosecutor.  See Morell, 524 F.2d at 555.  Thus, the prosecutor was under no duty to

seek information from Agent Lemay.

Furthermore, petitioner merely speculates that Agent Lemay had material

impeachment evidence.  Petitioner, however, fails to identify any evidence that Agent Lemay

actually did have, the suppression of which prejudiced him.  See Kyles, 514 U.S. at 434-38;

United States v. Manning, 56 F.3d 1188, 1198 (9th Cir. 1995) ("Evidence is material for Brady

purposes only if there is a reasonable probability that, had it been disclosed to the defense, the

result of the proceeding would have been different."); see also United States v. Flores, 430 F.2d

432 (9th Cir. 1976) (noting that government has no duty to fish through public records equally

accessible to defense to collate information).

Finally, the prosecutor produced extensive impeachment evidence in the form of

J.B.'s handler's name (Agent Lemay), J.B.'s rap sheet, at least two impeachable felonies and

information regarding J.B.'s relocation expenses provided in exchange for testifying.  Defense

counsel used this information, as well as J.B.'s sentencing consideration in previous cases and his

history as a drug user, to impeach him.  See United States v. Vgeri, 51 F.3d 876, 880 (9th Cir.

1995) (undisclosed impeachment evidence is immaterial and cumulative when the witness is

already sufficiently impeached); see also Ortiz v. Stewart, 149 F.3d 923, 936 (9th Cir. 1998)

(same).  In United States v. Blanco, 392 F.3d 382, 394 (9th Cir. 2004), the Ninth Circuit noted

that under "ordinary circumstances," the prosecutor's production of an informant's participation

in prior cases and the total compensation he received is sufficient under Brady.  Here, there is no

allegation that this case presents extraordinary circumstances requiring the prosecutor to produce

more than he did.

1        Next, petitioner argues that the prosecutor violated <u>Brady</u> when he failed to

2   identify evidence that was later discovered by petitioner's appellate counsel on the Internet.  This

3   additional evidence includes (1) an unpublished California Court of Appeals case, <u>People v.</u>

4   <u>Mabon</u>, (A109378), which discussed J.B., noting that he noted that he had handlers other than

5   Agent Lemay and that he had faked a mental illness in the past; (2) J.B. was found guilty of

6   assault with a deadly weapon as a juvenile; and (3) after petitioner's sentencing, J.B. was arrested

7   for first degree murder.  This argument should be denied as meritless.  First, petitioner presents no

8   evidence that the prosecutor had a duty to scour the state court records to locate an unpublished

9   opinion in which J.B. was mentioned.  Next, assuming without deciding that the prosecutor was

10  <u>Brady</u>-bound to disclose J.B.'s juvenile adjudication, the court finds that petitioner suffered no

11  harm because juvenile adjudications are not admissible as impeachment evidence.  <u>See People v.</u>

12  <u>Olivencia</u>, 204 Cal. App. 3d 1391 (Cal. Ct. App. 1988) (citing <u>People v. Sanchez</u>, 170 Cal. App.

13  3d 216, 218 (Cal. Ct. App. 1985)).  Finally, it is obvious that the prosecutor could not have

14  disclosed evidence of J.B.'s arrest for first degree murder before trial because that arrest occurred

15  after trial.

16      2.    <u>Ground Two</u>

17      In Ground Two, petitioner argues that the prosecutor committed misconduct when

18  he (1) elicited testimony that J.B. was relocated for safety reasons, (2) improperly vouched for

19  J.B.'s credibility and (3) improperly assigned beliefs to the detectives.[5]  Alternatively, to the

20  extent these claims are deemed procedurally barred, petitioner asserts ineffective assistance of

21  counsel.

22  /////

23

24      [5]  In the traverse, petitioner argues that the prosecutor committed misconduct when he
    implied that there was only one wallet at issue in this case, as opposed to two.  Petitioner
    contends this is prejudicial because it implies that petitioner went inside of the business with
25  Jones.  Because this argument was first raised in the traverse, the court declines to consider this
    claim.  <u>See Cacoperdo v. Demosthenes</u>, 37 F.3d 504, 507 (9th Cir. 1994) ("a Traverse is not the
26  proper pleading to raise additional grounds for relief").

a.   <u>J.B.'s Relocation</u>

ii.   <u>State Court Opinion</u>

Petitioner first argues that the prosecutor's questioning of Dale Joe resulted in prejudicial information being disclosed about petitioner.   The last reasoned rejection of this claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal:

> [Petitioner] contends the prosecutor committed misconduct by eliciting evidence that J.B. was relocated for safety reasons, and by making improper comments in his opening and closing summations.  However, his "failure to object forfeited any claim of prosecutorial misconduct or error by the trial court. [Citations.]" (*People v. Lancaster* (2007) 41 Cal.4th 50, 81-82.)

> Perhaps anticipating this conclusion, [petitioner] contends his trial counsel's failure to object constitutes ineffective assistance of counsel.  We consider [petitioner]'s points in turn.

> *A.  Relocation of J.B.*

> [Petitioner] claims the prosecutor committed misconduct in his direct examination of Dale Joe, an investigator for the Sacramento County District Attorney's Office, by implying that J.B. was "in potential danger or possible danger" and that J.B. "needed to be relocated for witness protection reasons." [Petitioner] reasons that, "[b]y leading jurors to believe threats were made to [J.B.], the prosecutor not only implied 'facts' [petitioner] could not possibly rebut satisfactorily; he prompted the jury to speculate that [petitioner] authorized the making of threats and to infer therefrom that [petitioner] was a murderer, ready to have [J.B.] killed just as he was ready to help kill Sussdorf."  (Citing *People v. Mason* (1991) 52 Cal.3d 909, 947, and *People v. Weiss* (1958) 50 Cal.2d 535, 554 [evidence of anonymous threat not connected with the defendant "should at once be suspect as . . . an endeavor to prejudice the defendant before the jury in a way which he cannot possibly rebut satisfactorily because he does not know the true identity of the pretender"].)  We are not convinced.

> The prosecutor's questioning of Joe did not violate any court ruling. (Compare *People v. Batts* (2003) 30 Cal.4th 660, 669 [question elicited statutorily inadmissible evidence that had been excluded by court order].)  "Conduct by a prosecutor that does not violate a court ruling is misconduct only if it amounts to 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury' [citations] or 'is so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process' [citation]." (*People v. Silva* (2001) 25 Cal.4th 345, 373.)

> Even if it was subject to an objection under *Mason* and *Weiss*, there was nothing deceptive or reprehensible about the prosecutor's questioning.  (*People v. Mason, supra,* 52 Cal.3d at p. 947; *People v. Weiss, supra,* 50 Cal.2d at p. 554.)

Nor was the questioning so egregious that it denied [petitioner] due process. (*People v. Silva*, *supra*, 25 Cal.4th at p. 373.)

In any event, the testimony elicited by the prosecutor – that the government concluded a paid informant should be relocated for safety reasons – is not the kind of evidence that would unduly bias the jury. [Petitioner] would not have fared any better had this evidence been excluded. Assuming the prosecutor committed misconduct, it was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

People v. Adcock, slip op. at 20-22.

iii.     Analysis

For claims of prosecutorial misconduct, the appropriate standard of review on a petition for writ of habeas corpus is the narrow one of due process and not the broad exercise of supervisory power. See Darden v. Wainwright, 477 U.S. 168, 181 (1986). A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." See id. Under Darden, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005).

Habeas corpus petitions asserting ineffective assistance of counsel are governed by the clearly established federal law presented in Strickland v. Washington, 466 U.S. 668, 686 (1984). See Baylor v. Estelle, 94 F.3d 1321, 1323 (9th Cir. 1996) (stating Strickland "has long been clearly established federal law determined by the Supreme Court of the United States"). To establish a cognizable claim for ineffective assistance of counsel, petitioner must prove "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. Under Strickland, petitioner must make two showings in order to justify issuance of the writ of habeas corpus. Id. at 688. First, petitioner must show incompetence of counsel. Id. Second, petitioner must show prejudice caused by counsel's incompetence. Id.

Upon review, the court finds that petitioner is not entitled to habeas relief. During direct examination, the prosecutor questioned Joe regarding expenses incurred by the Sacramento

17

District Attorney's Office ("the D.A.'s office") in exchange for J.B.'s testimony.  Joe testified that

the D.A.'s office incurred $22,300 in expenses in relocating J.B. for "witness protection reasons."

See Reporter's Transcript ("RT") 2 at 348.  This information bore on the jury's analysis of J.B.'s

credibility, it did not manipulate or misstate the evidence, and it did not implicate other specific

rights of petitioner.  See Darden, 477 U.S. at 182.  Thus, the court finds no misconduct by the

prosecutor in questioning Joe.  Petitioner's objection, however, does not lie solely with this

testimony.  Petitioner also objects to Joe's testimony regarding the threats that precipitated J.B.'s

relocation.  See Pet. at 5; Traverse at 8-9.  Yet examination of the record reveals that it was

defense counsel, not the prosecutor, who elicited this testimony.  See RT 2 at 351-52.  Any

prejudice, then, that resulted from Joe's testimony regarding the nature or source of the threats

J.B. received was the direct result of defense counsel's questioning on cross examination.

Accordingly, the court does not find prosecutorial misconduct here.

   b. J.B.'s Credibility

    I. State Court Opinion

  Petitioner next argues that the prosecutor committed misconduct by improperly

vouching for J.B.'s credibility during closing arguments.  The state appellate court also rejected

this claim:

> In his opening summation, the prosecutor told the jury: "what do we know about [J.B.]? We know that for years law enforcement has considered him to be a reliable informant.  That's why he gets used.  Law enforcement is not going to use somebody who lies to them.  It doesn't do us any good to present witnesses who lie.  That's not what we are here to do.  No prosecutor, no police officer wants to convict somebody based on phony evidence.  It violates our oath.  It violates everything we are here to do. [¶] So [J.B.] is used because he is good at what he does.  He gets information, and when he hears it, he turns it over."

> "'It is misconduct for prosecutors to bolster their case "by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it." [Citation.] Similarly, it is misconduct "to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness." [Citation.]' [Citation.]" (*People v. Riggs* (2008) 44 Cal.4th 248, 302.)

/////

The prosecutor's argument was based on J.B.'s testimony, elicited by defense counsel, that he had acted as an informant for Agent Lemay for two years and, before that, he had acted as an informant for the Oakland Police Department. The prosecutor's deductions that law enforcement had found J.B. reliable – and thus that he is "good" at what he does – followed logically from the fact that he continued to be used for a period of years.  The prosecutor's argument did not address "'''evidence available to the government, but not before the jury.'''" (*People v. Riggs*, *supra*, 44 Cal.4th at p. 302.)

The prosecutor's arguments that it "doesn't do us any good to present witnesses who lie," that "[n]o prosecutor, no police officer wants to convict somebody based on phony evidence," and that "[i]t violates our oath.  It violates everything we are here to do," did not attempt to invoke the "'''prestige, reputation, or depth of experience'''" of the prosecutor or his office.  (*People v. Riggs*, *supra*, 44 Cal.4th at p. 302.)  Nor did these arguments attempt to claim, as a matter of *fact* based on evidence not presented to the jury, that the prosecution witnesses were telling the truth. (Cf. *United States v. DeLoreto* (3d Cir. 1989) 888 F.2d 996, 999.)  Rather, the arguments appear to follow logically from the constitutional bar against intentionally using perjured testimony.  (*Giglio v. United States* (1972) 405 U.S. 150, 153 [31 L.Ed.2d 104].)

We note that [petitioner] cites *DeLoreto*, *supra*, 888 F.2d 996 for the proposition that prosecutorial vouching is reversible *per se*.  However, in *United States v. Zehrbach* (3d Cir. 1995) 47 F.3d 1252, 1254, the Third Circuit overruled *DeLoreto* insofar as it established a per se rule.

[Petitioner] suggests the prosecutor's comments were improper because *some* police and prosecutors "*do* use people who lie to them." [Petitioner] offers no empirical or other evidence of police or prosecutors suborning perjury, but, in any event, a timely objection and admonition could have avoided any alleged impropriety.  (*People v. Riggs*, *supra*, 44 Cal.4th at p. 298.)  It is not reasonably probable that [petitioner] could have fared any better had the claimed objectionable remarks been clarified.  (E.g., *People v. Aveha* (1996) 13 Cal.4th 394, 418.)  [¶] . . .

People v. Adcock, slip op. at 22-24.

           ii.     J.B.'s Credibility

"It is improper for the prosecution to vouch for the credibility of a government witness.  Vouching may occur in two ways: the prosecution may place the prestige of the government behind the witness or may indicate that information not presented to the jury supports the witness's testimony."  United States v. Roberts, 618 F.2d 530, 533 (9th Cir. 1980); see also United States v. Young, 470 U.S. 1, 18 (1985); United States v. Garcia-Guizar, 160 F.3d 511, 520 (9th Cir. 1998).  "The first type of vouching involves personal assurances of a witness's veracity."

1  United States v. Roberts, 618 F.2d at 533.  "The second type of vouching involves prosecutorial

2  remarks that bolster a witness's credibility by reference to matters outside the record."  Id.

3  However, "[t]o warrant habeas relief, prosecutorial vouching must so infect the trial with

4  unfairness as to make the resulting conviction a denial of due process."  Davis v. Woodford, 384

5  F.3d 628, 644 (9th Cir. 2004) (citation and internal quotation omitted).

6        Review of the entirety of the prosecutor's comments, taken in context, demonstrate

7  that the prosecutor was fairly arguing from evidence presented.  J.B. testified that he had been

8  working as an informant for over two years.  RT 3 at 294.  The prosecutor properly could argue

9  the evidence permitted the inference that J.B. was credible.  See United States v. Necoechea, 986

10  F.2d 1273, 1279 (9th Cir. 1993) (prosecutor's argument that witness told the truth because if she

11  were lying she would have done a better job, was not vouching, but rather permissible argument

12  of inference from evidence).  Additionally, the prosecutor's statement that "[n]o prosecutor, no

13  police officer wants to convict somebody based on phony evidence.  It violates our oath" is

14  unremarkable and should not have surprised anyone, let alone the jury.  Here, then, the

15  prosecutor's arguments were fairly based on the evidence and do not constitute improper

16  vouching.  The prosecutor was not placing the prestige of the government behind his truthfulness,

17  and did not suggest he knew facts outside the record.  Rather, he was arguing that, based on the

18  evidence, the jury could properly accept J.B.'s testimony.  There is no constitutional error arising

19  from these comments.

20        But even assuming, arguendo, the prosecutor's comments were improper, the jury

21  was instructed that attorneys' statements are not evidence. CT 1 at 262. The jury was also

22  specifically instructed on witness credibility.  Id. at 263-64.  These instructions made clear to the

23  jury that the prosecutor's comments were argument, not evidence.  Moreover, there is no evidence

24  that any vouching so infected the trial with unfairness as to make the resulting conviction a denial

25  of due process.  Davis, 384 F.3d at 644.

26  /////

c.     Detectives' Beliefs

I.     State Court Opinion

Lastly, petitioner argues the prosecutor committed misconduct during closing arguments when he assigned beliefs to the detectives.  The state appellate court rejected this claim as follows:

> D.     *Detectives' belief in [petitioner]'s guilt*
>
> In summation, defense counsel argued that the testimony of Detectives Cabral and Kolb supported his client's claim of innocence because the detectives were "fair" and "just did their job," and they had testified that [petitioner] was "cooperative" during the investigation.
>
> In closing summation, the prosecutor referred back to this argument and asserted that people who cooperate with the police may lie to them or withhold the truth.  He then said: "And remember, folks, these same detectives who [defense counsel] admits are professional, hard working, great people doing their job, are the same people who arrested his client for murder and are the people who brought us this case here today.  *It was their judgment that he is a murderer.*" (Italics added.)
>
> "'A prosecutor may not express a personal opinion or belief in the guilt of the accused when there is a substantial danger that the jury will view the comments as based on information other than evidence adduced at trial.' [Citations.] The danger that the jury will view the prosecutor's expressed belief in the defendant's guilt as being based on outside sources 'is acute when the prosecutor offers his opinion and does not explicitly state that it is based solely on inferences from the evidence at trial.' [Citations.]" (*People v. Lopez* (2008) 42 Cal.4th 960, 971; see *People v. Bain* (1971) 5 Cal.3d 839, 848.)
>
> In this case, the prosecutor voiced *the detectives'* belief, not his own. Their belief predated, and assertedly culminated in, "this case here today." Because the prosecutor did not state that the detectives' belief had been based upon inference from evidence later presented at trial, there was *some* danger that the jury would view the detectives' belief as being based on information *other than* the evidence adduced at trial.  (*People v. Lopez, supra,* 42 Cal.4th at p. 971.)
>
> "Nevertheless, not all such comments are improper.  Rather, '[t]he prosecutor's comments must . . . be evaluated in the context in which they were made, to ascertain if there was a substantial risk that the jury would consider the remarks to be based on information extraneous to the evidence presented at trial.' [Citations.]" (*People v. Lopez, supra,* 42 Cal.4th at p. 971.)
>
> Viewing the prosecutor's remarks in context, we find no error.  He effectively argued that the detectives, whose testimony the defense argued supported [petitioner]'s claim of innocence, were the same people who (1) formed the "judgment that he is a murderer," then (2) "arrested [petitioner] for murder,"

21

1   and then (3) "brought us this case here today."  The most plausible inference is
    that the detectives "brought" the jury the same facts that had underlay their
2   "judgment" that [petitioner] was a murder[er].  The risk that the jury would
    consider [the] detectives' "judgment" to be "'based on information extraneous to
3   the evidence [subsequently] presented at trial'" was not substantial on this record.
    (*People v. Lopez, supra,* 42 Cal.4th at p. 971.)

4

5       [Petitioner] further contends the prosecutor committed misconduct by
    telling the jury what the detectives' opinions allegedly were, even though he could
6   not have elicited the detectives' opinions of [petitioner]'s guilt.  (*People v.
    Coffman and Marlow* (2004) 34 Cal.4th 1, 77.)  However, the prosecutor's
7   rebuttal was a fair comment on the defense argument and was not misconduct.
    (*People v. McDaniel* (1976) 16 Cal.3d 156, 177.)

8       In any event, the prosecutor's comment was not prejudicial.  The jury
    knew that the detectives had arrested [petitioner] for murder.  The comment that
9   the detectives believed him guilty of the crime for which they arrested him could
    not have come as a surprise.  The remark was harmless by any standard.  (*People
10  v. Watson, supra*, 46 Cal.2d at p. 836; *Chapman v. California* (1967) 386 U.S. 18,
    24 [17 L.Ed.2d 705, 710-711].)

11

12  <u>People v. Adcock</u>, slip op. at 27-30.

13              ii.     <u>Analysis</u>

14      A review of the closing arguments demonstrates that the prosecutor's challenged

15  remarks do not rise to the level of prejudicial misconduct.  Initially, and as noted by the appellate

16  court, the prosecutor did not express his own opinions on petitioner's guilt.  Instead, he

17  commented on the detectives' beliefs.  Further, the prosecutor's comments were a fair response to

18  defense counsel's closing argument, in which the latter asserted that petitioner's cooperation with

19  Detectives Kolb and Cabral evidenced his innocence.  <u>See</u> RT 2 at 556, 565.  The prosecutor

20  responded to this argument by pointing out that despite petitioner's participation, the detectives'

21  investigation and subsequent initiation of criminal charges against petitioner evidenced the

22  detectives' belief that petitioner was involved in the murder.  As with petitioner's other

23  allegations of prosecutorial misconduct, in this instance the prosecutor was not placing the

24  prestige of the government behind the detectives' determination as to petitioner's guilt, and did

25  not suggest he knew facts outside the record.  Rather, it was a response to defense counsel's

26  argument and it was based on the evidence before the court.

Even assuming, however, that the comments were prejudicial, the court does not find any harm.  The weight of the evidence against petitioner was overwhelming, see United States v. Young, 470 U.S. 1, 19 (1985); the prosecutor's statements were isolated rather than a continued pattern, see Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir. 1987); and the comments did not manipulate or misstate any evidence, see Darden, 477 U.S. at 182.

Because the undersigned finds that there was no prosecutorial misconduct in any of the three instances discussed above, defense counsel could not have been ineffective for failing to object.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  Thus, petitioner's claim of ineffective assistance of counsel also fails.

3.    Sufficiency of the Evidence

Petitioner next argues that there was insufficient evidence to convict him of being a "major participant" in the burglary and robbery.[6]

a.    State Court Opinion

The last reasoned rejection of this claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal:

> [Petitioner] contends the judgment must be reversed because there was . . . insufficient evidence of the burglary-murder and robbery-murder special circumstances. [¶]
>
> "'To determine sufficiency of the evidence, we must inquire whether a rational trier of fact could find defendant guilty beyond a reasonable doubt.  In this process we must view the evidence in the light most favorable to the judgment and presume in favor of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence.  To be sufficient, evidence of each of the essential elements of the crime must be substantial and we must resolve the question of sufficiency in light of the record as a whole.'" (*People v. Carpenter* (1997) 15 Cal.4th 312, 387, quoting *People v. Johnson* (1993) 6 Cal.4th 1, 38; see *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560, 572-574].)
>
> [¶] . . .

---

[6] In his traverse, petitioner again attempts to introduce a new argument, namely, that there was insufficient evidence that he aided and abetted the burglary and robbery.  Again, the court declines to reach an issue first raised in a traverse.  See Cacoperdo v. Demosthenes, 37 F.3d at 507.

B.    *Special Circumstances*

The jury found true two special circumstances: [petitioner] committed the murder while engaged in the crimes of burglary and a robbery.  (§ 190.2, subd. (A)(17)(A) & (G).)   Because it was Jones who attacked Sussdorf with a hammer, [petitioner] was liable for the special circumstances if he (1) was a "major participant" in the commission of the burglary or robbery, and (2) acted with reckless indifference to human life.  (§ 190.2, subds. (c) & (d).)

"The term 'reckless indifference to human life' means 'subjective awareness of the grave risk to human life created by his or her participation in the underlying felony.' [Citation.]" (*People v. Proby* (1998) 60 Cal.App.4th 922, 928.)  This amply describes [petitioner]'s mental state.  He knew that Jones had gone "crazy" on Sussdorf and had started beating him with a hammer.  By then going outside and acting as a lookout knowing that Jones was beating Sussdorf with a hammer, [petitioner] displayed a reckless indifference to human life.

In sum, the murder verdict and special circumstances findings are supported by substantial evidence.  (*People v. Carpenter*, *supra*, 15 Cal.4th at p. 387.)

People v. Adcock, slip op. at 10-11, 13-14.

b.    Analysis

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a conviction, if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'"  Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318).  A petitioner for a federal writ of habeas corpus "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  In order to grant the writ, the habeas court must find that the decision of the state court reflected an unreasonable application of Jackson and Winship to the facts of the case.  See id.  A federal

habeas court determines sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law.  See Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983.

The "essential elements" of petitioner's special circumstance convictions can be found in § 190.2 of the California Penal Code, which provides that "the penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more ... special circumstances has been found ... to be true" at trial.  Cal. Penal Code § 190.2.  See People v. Estrada, 11 Cal.4th 568, 571-72 (Cal. 1995).  The felony-murder special circumstance is set forth in § 190.2(a)(17).  This provision provides that "the murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit, [any of twelve specified] felonies," including burglary and robbery.  Cal. Penal Code § 190.2(a)(17); see id. § 190.2(a)(17)(A) and (G).

In addition, to meet the special circumstance requirements of § 190.2(a)(17), a defendant must have either (1) been the actual killer of the victim, (2) possessed an intent to kill the victim, even if that defendant was not the actual killer, or (3) acted with "reckless indifference to human life" and as a "major participant" in one of the specified felonies, even if the defendant was not the actual killer and did not possess any intent to kill.  Id. § 190.2(b)-(d).  Thus, under § 190.2(d), a defendant who was not the actual killer and did not have intent to kill, but "who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in [§ 190.2(a)(17)] which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in [§ 190.2(a)(17)] has been found to be true . . . ."  Id. § 190.2(d) (emphasis added).

/////

25

1    The "statutory language of section 190.2(d) ... derives verbatim from the United

2 States Supreme Court's decision in <u>Tison v. Arizona</u>." <u>People v. Estrada</u>, 11 Cal. 4th 568, 575

3 (Cal. Ct. App. 1995) (internal citations omitted).  In fact, subsection (d) was added to § 190.2 in

4 order to bring California law into conformity with the <u>Tison</u> decision.  <u>See id.</u>; <u>People v. Proby</u>,

5 60 Cal. App. 4th 922, 927-28 (Cal. Ct. App. 1998); <u>People v. Bustos</u>, 23 Cal. App. 4th 1747, 1753

6 (Cal. Ct. App. 1994).  <u>Tison</u> involved two brothers sentenced to death for committing first degree

7 murder in connection with armed robbery, kidnaping and theft of a motor vehicle.  The U.S.

8 Supreme Court held that the death penalty may be constitutionally imposed under the Eighth and

9 Fourteenth Amendments on an accomplice to a felony-murder where there was "major

10 participation in the felony committed, combined with reckless indifference to human life."  <u>Tison</u>

11 <u>v. Arizona</u>, 481 U.S. 137, 158 (1987).

12    Because "<u>Tison</u> is the source of the language of section 190.2(d) ... the

13 constitutional standards set forth in that opinion are therefore applicable to all allegations of a

14 felony-murder special circumstance [under California law], regardless of whether the People seek

15 and exact the death penalty or a sentence of life without parole."  <u>Estrada</u>, 11 Cal. 4th at 575-76.

16 Significantly, the <u>Tison</u> court observed that "the reckless disregard for human life implicit in

17 knowingly engaging in criminal activities known to carry a grave risk of death represents a highly

18 culpable mental state . . . ."  <u>Id.</u> at 157-58.  In the high court's view, "some nonintentional murders

19 may be among the most dangerous and inhumane of all ... [such as] the robber who shoots

20 someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have

21 the unintended consequence of killing the victim as well as taking the victim's property.  This

22 reckless indifference to the value of human life may be every bit as shocking to the moral sense as

23 an 'intent to kill.'"  <u>Id.</u> at 157.  Finally, the <u>Tison</u> court noted that although "major participation"

24 and "reckless indifference to human life" are distinct requirements, they will frequently overlap.

25    For example, we do not doubt that there are some felonies as to which one could
       properly conclude that any major participant necessarily exhibits reckless
26     indifference to the value of human life.  Moreover, even in cases where the fact

26

1       that the defendant was a major participant in a felony did not suffice to establish
reckless indifference, that fact would still often provide significant support for
2       such a finding.

3  Id. at 158 n. 12.

4         The California Supreme Court has also clarified the meaning of the statutory

5  phrase "reckless indifference to human life" in § 190.2(d) in the case People v. Estrada.  Estrada

6  involved two defendants who were convicted of committing first degree murder during the

7  commission of a robbery and burglary.  See Estrada, 11 Cal.4th at 572.  In that case, the two

8  defendants in Estrada were sentenced to life without the possibility of parole, and their sentences

9  for the robbery and burglary convictions were stayed by the trial court.  See id. at 573.  The

10  Estrada court held that Tison "instructs that the culpable mental state of 'reckless indifference to

11  life' is one in which the defendant 'knowingly engage[s] in criminal activities known to carry a

12  grave risk of death,' and it is this meaning that [the California Supreme Court] ascribe[s] to the

13  statutory phrase 'reckless indifference to human life' in section 190.2(d)."  Id. at 577 (internal

14  citations omitted).  In other words, "reckless indifference to human life" means that a defendant

15  subjectively appreciated that his or her participation in a felony created a grave risk to human life.

16  Id. at 581.

17         Here, petitioner argues there was insufficient evidence to show that he was aware

18  that his co-defendant Jones intended to "burglarize, rob, or steal from anyone."  The record,

19  however, shows ample evidence of petitioner's awareness, in particular J.B.'s testimony that

20  petitioner and Jones "went to hit a lick" or, in other words, "to rob" a man.  RT 2 at 287-88.

21  There, "they stripped [the victim] and . . . while they were stripping the guy, . . . [Jones] went

22  crazy on the old man, started beating him."  Id. at 287.  This "spooked" petitioner, who then went

23  outside to act as a lookout.  See id. at 288.  This testimony, coupled with petitioner's own

24  statements that he and Jones were going to the auto dealership to do a "lick," which he defined as

25  a "petty theft, like going into a grocery store" and as "getting some money from somebody," id. at

26  /////

376-82, 412-14, are sufficient evidence to warrant a finding that petitioner was a "major participant" in the burglary and robbery. As such, petitioner is not entitled to relief on this claim.

### 4.  Ineffective Assistance of Counsel

In his last ground for relief, petitioner argues his trial counsel was ineffective for (1) failing to object to the prosecutor's alleged misconduct; (2) failing to investigate the credibility of the prosecution's key witness; (3) failing to move for a directed verdict; and (4) failing to "zealously defend" petitioner. To the extent that respondent asserts that these claims are unexhausted, the undersigned rules on the merits as permitted by 28 U.S.C. § 2254(b)(2).

### a.  Prosecutor's Misconduct

Petitioner first argues his trial counsel was ineffective for failing to object to the prosecutor's misconduct. As previously discussed, the court did not find any instances of misconduct, and, therefore, counsel could not have been ineffective for failing to object.

### b.  Investigation of J.B.'s Credibility

Next, petitioner argues counsel was ineffective for failing to investigate J.B.'s credibility. Generally, defense counsel must, "at a minimum, conduct a reasonable investigation enabling him to make informed decisions about how best to represent his client." Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994) (emphasis omitted). The failure to investigate constitutes deficient performance when the defense attorney "neither conduct[s] a reasonable investigation nor ma[kes] a showing of strategic reasons for failing to do so." Id. at 1456. "'A lawyer who fails adequately to investigate, and to introduce into evidence, [information] that demonstrates his client's factual innocence, or that raises sufficient doubts as to that question to undermine confidence in the verdict, renders deficient performance.'" Reynoso v. Giurbino, 462 F.3d 1099, 1112 (9th Cir. 2006) (quoting Lord v. Wood, 184 F.3d 1083, 1093 (9th Cir. 1999)). "The failure to investigate is especially egregious when a defense attorney fails to consider potentially exculpatory evidence." Rios v. Rocha, 299 F.3d 796, 805 (9th Cir. 2002). Many opinions in the Ninth Circuit have identified failures to investigate or present exculpatory

1  evidence as constituting ineffective assistance of counsel.  See Avila v. Galaza, 297 F.3d 911, 919

2  (9th Cir. 2002) (holding that counsel's failure to investigate evidence that defendant's brother was

3  the shooter constituted deficient performance); Lord, 184 F.3d at 1095-96 (holding that counsel's

4  failure to call key witnesses whose testimony undermined the prosecutor's case constituted

5  deficient performance); Hart v. Gomez, 174 F.3d 1067, 1070 (9th Cir. 1999) (holding that

6  counsel's failure to review key documents corroborating defense witness's testimony constituted

7  deficient performance); Brown v. Myers, 137 F.3d 1154, 1158 (9th Cir. 1998) (holding that

8  counsel's failure to investigate and put on the stand possible alibi witnesses constituted ineffective

9  assistance); Sanders v. Ratelle, 21 F.3d 1446, 1457 (9th Cir. 1994) (holding that counsel's failure

10  to investigate evidence that someone else was the killer constituted deficient performance).

11            However, the Supreme Court has counseled that "[j]udicial scrutiny of counsel's

12  performance must be highly deferential."  Strickland, 466 U.S. at 689.  All attempts must be made

13  to evaluate the attorney's performance under the circumstances at the time, not through the lens of

14  hindsight.  Id.  As a result, "a court must indulge a strong presumption that counsel's conduct falls

15  within the wide range of reasonable professional assistance."  Id.  Ultimately, strategic decisions

16  by counsel are not to be second-guessed, so long as they were reasonably informed by the facts

17  available to the attorney at the time.  See Hendricks v. Vasquez, 974 F.2d 1099, 1109 (9th Cir.

18  1992) (remanding to "determine if counsel's decision was a strategic one, and, if so, whether the

19  decision was a sufficiently informed one").

20            As a repackaged prosecutorial misconduct claim, petitioner argues that his trial

21  counsel was ineffective for failing to locate impeachment evidence as to J.B. that was later

22  discovered by his appellate counsel following an Internet search.  As previously discussed, this

23  additional evidence includes (1) an unpublished California Court of Appeals case, People v.

24  Mabon, (A109378), which noted that J.B. had handlers other than Lemay and that J.B. has faked

25  mental illness in the past; (2) J.B. was found guilty of assault with a deadly weapon as a juvenile;

26  and (3) after petitioner's sentencing, J.B. was arrested for first degree murder.

1     Here, the record reflects that defense counsel made multiple efforts to investigate

2  J.B.'s background.  Counsel began by seeking <u>Brady</u> material from the prosecutor, which included

3  J.B.'s rap sheet, "two or three" impeachable felonies suffered by J.B., a list of expenses paid to

4  J.B. for his participation in the investigation and contact information for J.B.'s handler, Agent

5  Lemay.  RT 1 at 19.  Next, he contacted Agent Lemay on at least one occasion (possibly two),

6  though did not receive a return phone call.  <u>Id.</u> at 20.  Lastly, counsel requested and received an

7  evidentiary hearing, during which he questioned J.B. at length regarding his history as an

8  informant.  <u>Id.</u> at 242-72.  Counsel elicited information that J.B. had prior convictions for burglary

9  in Oakland; had been relocated previously in connection with a homicide case in Alameda

10  County, for which he had served as an informant and had testified during trial; that J.B. had

11  communicated with and/or served as an informant for the Sacramento County Sheriff's

12  Department, the Sacramento County District Attorney's Office, the Alameda County Narcotics

13  Task Force, the Oakland Police Department Narcotics Task Force and the Oakland Homicide

14  Detail; and the identities of J.B.'s handlers in these other agencies.  Furthermore, additional

15  information was elicited off-the-record following this hearing, which "satisfied darn near all of

16  [defense counsel's] concerns" about J.B.'s history as an informant since 2005.  <u>See</u> RT 1 at 273-

17  76.  The court does not find deficient performance on these facts.

18     Additionally, trial counsel's performance was not deficient for failing to locate the

19  aforementioned information identified by petitioner's appellate counsel on direct appeal.  First,

20  assuming without deciding that counsel had a duty to search through unpublished California Court

21  of Appeal opinions, petitioner has not shown prejudice.  The record clearly reflects that defense

22  counsel impeached J.B. with evidence of his prior felony convictions, his period of incarceration,

23  his use of Methadone, his receipt of relocation benefits in two homicide cases, his receipt of

24  sentencing benefits in exchange for serving as an informant in a previous case and his interest in a

25  monetary reward for providing information in petitioner's case.  <u>See</u> RT 2 at 292-316, 322-342,

26  344-346.  That J.B. had other handlers (which had previously been established at the 402

1   evidentiary hearing) and had faked a mental illness would not have contributed so much to

2   petitioner's defense that, without this information, confidence in petitioner's underlying case

3   would have been undermined.  Next, as to counsel's purported failure to investigate J.B.'s

4   juvenile history, it has already been determined that petitioner suffered no harm because juvenile

5   adjudications would not have been admissible as impeachment evidence in any event.  See People

6   v. Olivencia, 204 Cal. App. 3d 1391 (Cal. Ct. App. 1988) (citing People v. Sanchez, 170 Cal.

7   App. 3d 216, 218 (Cal. Ct. App. 1985)).  Finally, as previously discussed, J.B. could not have

8   been impeached with evidence of his arrest for first degree murder if said arrest occurred after

9   petitioner's trial.

10          c.      "Directed Verdict"

11          Petitioner also argues that counsel's performance was deficient for failing to move

12  for a "directed verdict of not guilty" after the prosecutor's failure to establish corpus delicti.  A

13  defendant, however, may not move for a directed verdict or dismissal for insufficiency of the

14  evidence in a criminal trial.  See Witkins, California Criminal Law 3d (2000) Crim. Trial, § 562,

15  p. 804.  It appears, however, that petitioner's argument is instead that defense counsel was

16  ineffective for failing to move for judgment of acquittal pursuant to Cal. Penal Code § 1181.1.

17  Pursuant to Section 1181.1, "[i]n a case tried before a jury, the court on motion of the defendant

18  or on its own motion, at the close of the evidence on either side and before the case is submitted to

19  the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses

20  charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a

21  conviction of such offense or offenses on appeal."

22          Petitioner's argument rests on a mistaken understanding of the corpus delicti rule.

23  "In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime

24  itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause.  In

25  California, it has traditionally been held, the prosecution cannot satisfy this burden by relying

26  exclusively upon the extrajudicial statements, confessions, or admissions of the defendant."

1  People v. Alvarez, 27 Cal. 4th 1161, 1168-69 (Cal. 2002).  Although petitioner correctly asserts

2  that the prosecution must establish the corpus delicti of the crime independently of the defendant's

3  extrajudicial statements, the corpus delicti doctrine requires only a showing that a crime occurred,

4  not a showing of the defendant's criminal liability for it.  People v. Crew, 31 Cal. 4th 822, 837

5  (2003) ("The identity of the perpetrator is not an element of the corpus delicti"); People v.

6  Gutierrez, 28 Cal. 4th 1083, 1129 (2002) (corpus delicti rule was not violated when independent

7  evidence established rape and defendant's extrajudicial admissions established his aider and

8  abettor liability).  In this case, the victim's body was found at the office of his used car dealership

9  with serious injuries, and the victim died ten days after the attack.  Based on these facts, the

10  prosecution satisfied the corpus delicti requirement.

11         Furthermore, the corpus delicti requirement "does not apply to proof of a felony

12  underlying a charge of felony murder."  People v. Sapp, 31 Cal. 4th 240, 285 (Cal. 2003).  It also

13  does not apply to felony-based special circumstances.  See Cal. Penal Code § 190.41 ("the corpus

14  delicti of a felony-based special circumstance . . .  need not be proved independently of a

15  defendant's extrajudicial statement.").  Accordingly, there is no reasonable likelihood that the trial

16  court would have granted a motion for acquittal and trial counsel was not ineffective for failing to

17  make such a motion.

18              d.     Zealously Defend

19         Next, petitioner argues that trial counsel was ineffective for failing to "zealously

20  defend" him.  Petitioner's argument fails as vague and conclusory.  The court's review of

21  petitioner's claim is limited to only those matters specifically identified as examples of counsel's

22  alleged ineffective assistance.  Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995), cert. denied,

23  517 U.S. 1143 (1996) (conclusory allegations unsupported by a statement of specific facts do not

24  warrant habeas relief).  Petitioner here cites to no specific facts in support of this claim.

25  /////

26  /////

32

1      5.      Cumulative Error

2              Petitioner lastly argues that the cumulative effect of the errors alleged herein

3    constitute a denial of due process.

4              The Ninth Circuit has concluded that under clearly established United States

5    Supreme Court precedent the combined effect of multiple trial errors may give rise to a due

6    process violation if it renders a trial fundamentally unfair, even where each error considered

7    individually would not require reversal.  Parle v. Runnels, 505 F.3d 922, 927 (9th. Cir. 2007)

8    (citing Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974), and Chambers v. Mississippi, 410

9    U.S. 284, 290 (1973)).  "The fundamental question in determining whether the combined effect of

10   trial errors violated a defendant's due process rights is whether the errors rendered the criminal

11   defense 'far less persuasive,' Chambers, 410 U.S. at 294, and thereby had a 'substantial and

12   injurious effect or influence' on the jury's verdict."  Parle, 505 F.3d at 927 (quoting Brecht v.

13   Abrahamson, 507 U.S. 619, 637 (1993)).  See also Hein v. Sullivan, 601 F.3d 897, 2010 WL

14   1427588, *15 (9th Cir. 2010) (same).

15             This court has addressed each of petitioner's claims and has concluded that no

16   error of constitutional magnitude occurred.  Accordingly, petitioner is not entitled to relief on his

17   claim of cumulative error.

18   III.   Evidentiary Hearing

19             Petitioner has also filed a motion for an evidentiary hearing.  Petitioner's request

20   for an evidentiary hearing must be denied.  The purpose of an evidentiary hearing is to resolve the

21   merits of a factual dispute.  An evidentiary hearing on a claim is required where it is clear from

22   the petition that: (1) the allegations, if established, would entitle the petitioner to relief; and (2) the

23   state court trier of fact has not reliably found the relevant facts.  See Hendricks v. Vasquez, 974

24   F.2d 1099, 1103 (9th Cir. 1992).  As the function of an evidentiary hearing is to try issues of fact,

25   Townsend v. Sain, 372 U.S. 293, 309 (1963) (overruled in part by Keeney v. Tamayo-Reyes,

26   /////

504 U.S. 1 (1993)), such a hearing is unnecessary when only issues of law are raised.  Id.  In this case, there are no issues of factual dispute.  Accordingly, an evidentiary hearing is unnecessary.

For all of the foregoing reasons, petitioner's application for a writ of habeas corpus should be denied.  Pursuant to Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, "[t]he district court must issue or a deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11, 28 U.S.C. foll. § 2254.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The court must either issue a certificate of appealability indicating which issues satisfy the required showing or must state the reasons why such a certificate should not issue.  Fed. R. App. P. 22(b).  For the reasons set forth in these findings and recommendations, petitioner has not made a substantial showing of the denial of a constitutional right.  Accordingly, no certificate of appealability should issue.

Accordingly, IT IS HEREBY ORDERED that petitioner's request for an evidentiary hearing is denied; and

IT IS HEREBY RECOMMENDED that

1.  Petitioner's application for a writ of habeas corpus be denied; and

2.  The district court decline to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The

/////

/////

/////

1  parties are advised that failure to file objections within the specified time may waive the right to

2  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3  DATED:  March 12, 2012.

4

5

6
                              UNITED STATES MAGISTRATE JUDGE
7
/014;adco0705.157
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26